UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CR 25·482 SRN/DLM

| | |
|---|---|
| UNITED STATES OF AMERICA, | **INDICTMENT** |
| Plaintiff, | 18 U.S.C. § 1343 |
| | 18 U.S.C. § 981(a)(1)(C) |
| v. | 21 U.S.C. § 853(p) |
| | 28 U.S.C. § 2461(c) |
| KAAMIL OMAR SALLAH, | |
| Defendant. | |

THE UNITED STATES GRAND JURY CHARGES THAT:

At times relevant to this Indictment:

1.      The defendant participated in a scheme to fraudulently receive Medicaid benefits from Minnesota's Housing Stability Services Program, a program designed to help people with disabilities and addictions find and maintain housing. Rather than provide such help, the defendants obtained and misappropriated more than a million dollars in program funds that were intended as reimbursements for services provided to those people.

**A.      Background on Minnesota's Housing Stability Services Program**

2.      In July 2020, Minnesota became the first state in the country to offer Medicaid coverage for Housing Stabilization Services. The Housing Stabilization Services Program is a Medical Assistance (that is, Medicaid) benefit designed to help people with disabilities, including seniors and people with mental illnesses and substance use disorders, find and maintain housing.

3.      The Program permitted reimbursements for four principal kinds of services:

SCANNED
DEC 1 6 2025
U.S. DISTRICT COURT MPLS

*United States v. Kaamil Omar Sallah*

(a) Housing consultation, during which a consultant (like a social worker or nurse) helps a beneficiary complete a Department of Human Services form called a "Person-Centered, Housing Focused Plan." The Plan is a form available from the Department of Human Services. It requires minimal information. Consultants could bill Medicaid about $174 for a consulting session.

(b) Housing transition services, during which a provider helps a beneficiary plan for, find, and move into housing. Providers can bill about $68 per hour of transition services provided.

(c) Housing sustaining services, during which a provider helps a beneficiary keep their housing after they have moved in (including through behavioral management of the beneficiary). For sustaining services, too, providers can bill about $68 per hour.

(d) Moving expenses of up to $3,000, subject to conditions.

4.    By design, the Program had a low barrier to entry for new providers. A would-be provider needed only be at least 18 years old, submit some enrollment paperwork to Minnesota Department of Human Services (DHS), undergo a background check, and complete about five hours of online training videos. Providers did not have to have a medical license or social work training.

5.    Similarly, the Program had a low barrier to entry for beneficiaries. Beneficiaries needed only be at least 18 years old, have coverage under Medical Assistance (which is Minnesota's Medicaid program for people with low income), have a documented disability or "disabling condition," and be experiencing housing instability. Program rules defined those final two conditions expansively. To receive billable services, a beneficiary meeting these requirements just needed to complete, with a Program-qualified consultant, a document called a Housing Focused Plan, detailing their housing challenges and needs. That done, the beneficiary could enroll with a provider. And the provider could start billing for services provided.

2

*United States v. Kaamil Omar Sallah*

6. To bill, a provider needed to submit only the names of the beneficiaries serviced, the types of billable services provided, and the hours worked.

7. The HSS Program's low barriers to entry and minimal records requirements for reimbursement combined to make the Program susceptible to fraud.

8. Before the Program's inaugural year, DHS predicted the Program would cost about $2.6 million annually. That proved to be inaccurate. In 2021 alone, the Program paid out more than $21 million in claims. That figure ballooned in the following years: $42 million in 2022, $74 million in 2023, $104 million in 2024. In just the first six months of 2025, the Program paid out another $61 million.

9. A federal investigation revealed that many Program providers defrauded the system. These providers acquired the names of Program-eligible beneficiaries from facilities like addiction treatment centers. They then used those individuals' information to submit inflated and fake reimbursement claims. In this fashion, the providers acquired substantial pay-outs of taxpayer money to which they were not entitled. They used those ill-gotten gains for their own enrichment.

**B.    The Defendant and His Role**

10. KAAMIL OMAR SALLAH owned and operated a company called SafeLodgings, Inc.

11. SALLAH registered SafeLodgings with the Minnesota Secretary of State in March 2023. That same month, SALLAH submitted paperwork to enroll SafeLodgings as an HSS Provider.

12. Through SafeLodgings, SALLAH was supposed to provide housing consulting, transitioning, and sustaining services to qualifying people in need.

3

*United States v. Kaamil Omar Sallah*

SafeLodgings was paid at quarter-hourly rates and with Medicaid dollars based on the services it claimed to provide.

13.     In all, between approximately March 2023 and August 2025, SALLAH and his company fraudulently claimed to be entitled to approximately $1.4 million for providing Housing Stabilization Services and received nearly $1.3 million.

### Counts 1-4
(Wire Fraud)

14.     Paragraphs 1 through 13 are incorporated herein.

15.     From in or about March 2023 through about August 2025, in the State and District of Minnesota, and elsewhere, the defendant,

**KAAMIL OMAR SALLAH**,

and others known and unknown to the grand jury, did knowingly devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

16.     The purpose of the scheme was to fraudulently obtain Housing Stability Services Program funds by causing the submission of fake and inflated bills. The defendant was responsible for providing program-eligible housing services through SafeLodgings to people in need. However, in furtherance of the scheme, the defendant and his conspirators caused the submission of false claims information that significantly overrepresented the services they provided. In so doing, the defendant received taxpayer dollars to which he was not entitled.

4

*United States v. Kaamil Omar Sallah*

17.     In furtherance of the scheme to defraud, in or about March 2023, SALLAH registered SafeLodgings with the Minnesota Secretary of State and then submitted paperwork to DHS to operate SafeLodgings as an HSS provider. The defendant thereafter purported to service individuals in need through SafeLodgings from a building in Forest Lake, Minnesota.

18.     As SafeLodgings's owner and manager, SALLAH was responsible for the company's billing. He submitted many of those bills through a third-party electronic health records company, to which SafeLodgings paid a subscription. As SALLAH knew, many of those bills were inflated and fraudulent.

19.     In his submissions, SALLAH repeatedly claimed that individual SafeLodgings employees had serviced multiple beneficiaries in the same one- or two-hour blocks. Such double billing is neither practically possible nor is it permitted under Program rules.

20.     SALLAH submitted bills to the Program claiming that he personally provided reimbursable services. Those bills, too, include double billing. In 2024 alone, SALLAH claimed to have personally provided more than 3,600 billable service hours.

21.     To further his scheme, SALLAH hired many employees to expand operations at SafeLodgings. One of SALLAH's employees, Employee A, had previously worked at another HSS Provider, Leo Human Services. Employee A had been fired from Leo—which itself submitted millions of dollars in fraudulent HSS bills—because Employee A's fraudulent conduct at that company was too brazen.

*United States v. Kaamil Omar Sallah*

22.   SALLAH diverted much of his fraud proceeds to conspirators, including to his employees at SafeLodgings, and he spent much of it on himself and on investments, including nearly $150,000 in a cryptocurrency exchange.

23.   Ultimately, SALLAH fraudulently claimed to service nearly 150 different beneficiaries through SafeLodgings and for such services claimed to be entitled to about $1.4 million. SALLAH's operations provided only a fraction of that claimed total.

24.   In November 2025, federal agents served SALLAH, as SafeLodgings's owner, with a grand jury subpoena for company records related to the HSS Program. SALLAH retained counsel for the purpose of responding to that subpoena. Then he fled the country. On or about November 26, SALLAH flew from Minneapolis/St. Paul to Amsterdam. He has not returned to the United States.

25.   From in or about March 2023 through about August 2025, in the State and District of Minnesota, and elsewhere, the defendant, as set forth below, and others known and unknown to the grand jury, did knowingly devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

*United States v. Kaamil Omar Sallah*

26.     On or about the dates listed below, in the State and district of Minnesota and elsewhere, the defendant,

**KAAMIL OMAR SALLAH,**

and others known and unknown to the grand jury, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| Count | Date (on or about) | Wire Details |
|---|---|---|
| 1 | March 15, 2024 | Email from KAAMIL SALLAH to Conspirator 1, including electronic health records login information |
| 2 | May 22, 2024 | Email exchanges with KAAMIL SALLAH concerning purported beneficiary Imani C. |
| 3 | July 12, 2024 | Email from KAAMIL SALLAH attaching a client list |
| 4 | October 27, 2024 | Email to KAAMIL SALLAH concerning purported beneficiary J. Johnson |

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATIONS

27.     Counts 1 through 4 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) in conjunction with Title 28, United States Code, Section 2461(c).

28.     If convicted of any of Counts 1 through 4 of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense charged.

*United States v. Kaamil Omar Sallah*

29.    If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____        _____

UNITED STATES ATTORNEY            FOREPERSON